**TELEDYNE McCORMICK SELPH**

v.

**The UNITED STATES.**

No. 77–73.

United States Court of Claims.

July 8, 1977.

---

David H. Semmes, Washington, D. C., attorney of record for plaintiff; Warren E. Olsen and Pierson, Semmes, Crolius & Finley, Washington, D. C., of counsel.

Thomas J. Byrnes, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant; Herbert Berl, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA and BENNETT, Judges.

## OPINION

PER CURIAM:

Plaintiff sues the United States for patent infringement, within our jurisdiction under 28 U.S.C. § 1498. The case is before us on exceptions by both parties to the recommended decision submitted by Trial Judge Colaianni under Rule 134(h). The trial judge concluded not only that plaintiff's patent was not infringed, but also that the patent withstood defendant's various challenges to its validity. Upon consideration of the briefs and oral argument of counsel, we agree with the trial judge's conclusion of noninfringement, and adopt his opinion and findings of fact and conclusion of law to this extent, as the opinion and findings of the court. The findings of fact are not printed herewith, but have been furnished to the parties. Furthermore, we appreciate his furnishing us his opinion and findings with regard to the patent's validity. In the event we had disagreed on the first question, the trial judge's thorough efforts would have spared the court and the parties the inconvenience of another trial to develop the issues completely. In present circumstances, however, we think it proper not to render a determination of validity that is immaterial to our disposition of this case. We have modified the trial judge's opinion, therefore, to delete all references to the validity question, and we do not adopt findings 71–76. It is therefore concluded that plaintiff is not entitled to recover, and the petition is dismissed.

The trial judge's report, as modified, follows:

## OPINION OF TRIAL JUDGE

COLAIANNI, Trial Judge:

In this patent suit brought pursuant to 28 U.S.C. § 1498, plaintiff, Teledyne McCormick Selph, seeks "reasonable and entire compensation" for the alleged unauthorized use by the Government of plaintiff's patented invention. The parties agreed that the issues of infringement and validity of the patent would be first determined. The parties further agreed that the amount of plaintiff's recovery, if any, would be deferred until after a final ruling by the court on the questions of infringement and validity.

The patent in suit, United States Patent No. 3,238,873 (hereinafter referred to as the "Allen" patent), issued on March 8, 1966, to Robert C. Allen for an invention entitled "Detonating Fuse Termination." Plaintiff Teledyne is by mesne assignment the present owner of all right, title and interest in the patent.

While defendant's answer raised the usual large number of defenses typical to patent litigation generally, the posttrial papers have in the main concentrated its defense on 35 U.S.C. §§ 102 and 103, and, as well, the assertion that the claims in the patent in suit have not been infringed by defendant. For reasons explained in detail hereinbelow, it is concluded that plaintiff's patent was not infringed.

In the early 1960's the aerospace industry was experiencing some problems in the use of conventional electrical stimulus transfer systems. The trial record established that the amount of electronic equipment used by the air and space programs for both radar and communications had reached such a high level that the leads and connecting wires of electrically-initiated ordinance devices were acting as antennas. The leads would therefore pick up electrical charges from transmitters and/or electrostatically and prematurely fire the ordnance devices. In an attempt to avoid the hazards of acci- dental firings by electrically-initiated ordinance devices, the National Aeronautics & Space Administration (hereinafter referred to as "NASA") turned to detonating fuse-type stimulus transfer systems.

Since many NASA engineers in the early 1960's did not look with favor on the use of explosive devices in the space program, Mr. Allen, inventor of the patent in suit, suggested the terminology "nonelectric stimulus transfer system" (hereinafter referred to as "NESTS") to avoid the use of the word "explosive." Nonetheless, the trial record shows that explosive transfer systems had been used by NASA, albeit to a very limited extent in the 1960–63 timeframe, and the escape system of the Gemini project is an example of one such use.

In use, it was not unusual for the explosive transfer lines not only to pass through the highly flammable atmosphere inside an aircraft or missile, but also to be located within close proximity to delicate and easily damaged instruments. NASA engineers were thus afraid that the use of explosive transfer systems could possibly result in the generation of shrapnel and/or gases that would blow up the aircraft, or, at the very least, cause injury to personnel and/or damage to vital instruments.

Of necessity, all NESTS require the use of a detonating fuse of one sort or another. Detonating fuses, such as confined detonating fuses (hereinafter referred to as "CDF"), are designed to propagate a signal at a rate of 22,000 to 25,000 ft/sec (approximately 18,000 mi/hr), while, at the same time, confining the shrapnel and/or gases resulting from the detonation. By definition, CDF is a mild detonating fuse which has been completely confined with a number of layers of textile and plastic sheaths so that no shrapnel or other potentially hazardous particles escape upon detonation of the fuse. Mild detonating fuse, in turn, is defined as a continuous column of crystalline high explosive encased in a metal sheath.

In order properly to initiate or operate switches, valves, cut cables, trigger aircraft or spacecraft escape systems, or perform

other ordnance-type functions, it is essential that the fuse be terminated safely and without the escape of shrapnel and/or particles during detonation. Numerous attempts had been made prior to the invention in suit to design a coupling for terminating detonating fuse in an explosive stimulus transfer system. More often than not, the early coupling turned out to be an expensive screw-down type. Screw-down couplings were held in disfavor not only because of their high cost, but for the equally important reason that the transfer lines had to be run through remote, inconvenient and inaccessible areas which made the use of handtools to couple the mating parts together awkward at best. More importantly, the early couplings were ineffective to contain the potentially hazardous particles that are generated by the initiation of a detonating fuse.

In an effort to avoid the problems experienced with screw-down-type couplings, the industry generally attempted to adopt the quick disconnect fittings used in electrical transfer lines for use in a NESTS system. In the 1962–63 timeframe, the Bendix PT bayonet-type connector was the electrical connector that was preferred and used by most branches of the service. The vibration and environmental performance levels of this connector were found to be satisfactory by all of the military services.

However, early attempts by Mr. Allen and others in the field to develop a suitable quick disconnect fitting for use in a NESTS system all ended in failure. The early end fittings separated in operation for a variety of reasons, including the following, permitting the escape of shrapnel and particles:

(1) The bayonet pins which locked the two-part coupling together would be sheared off by the 2,000,000 p. s. i. force which occurred within the termination coupling upon detonation; or

(2) On many occasions, the force of the explosion would separate the detonator fuse from the end termination.

In an attempt to solve the above problems, the patentee, similar to the steps taken by others in the field, made one or more of the following modifications to the end fittings: (1) strengthened the end termination couplings; (2) designed vent holes in the fittings to enable the escape of explosive gases; (3) manufactured the end termination couplings out of high strength alloys; and (4) machined the bayonet pins out of the same block of material from which the termination was machined, producing a one-piece design. Following one or more of these unsuccessful efforts, Mr. Allen embarked upon a major redesign of the end termination fitting that ultimately resulted in the patented invention.

### The Patent in Suit

The Allen patent describes a nonelectrical stimulus transfer system for use in the aerospace industry, in which the detonating fuse is terminated with a quick disconnect coupling.

Structurally, the end of the detonating fuse is crimped into a coupler body. A reduced portion of the fuse, in which the cross-sectional area of the explosive core may be reduced relative to its cross-sectional area within the main part of the fuse, extends beyond the crimp through a small bore in the coupler body and into an extending probe. When coupled to a mating receptacle, the probe extends through a small bore of a baffle into the interior of the mating receptacle. A bayonet-type quick disconnect fitting is mounted around the coupler body by suitable retaining clips and springs. Appropriate recesses are provided on the fitting's outer surface. The probe is accommodated by complementary openings on the mating receptacle and, in addition, projecting pins are suitably designed to be received by the recesses of the fitting to lock the coupling body and mating receptacle in place.

In use, an explosion initiated at one end of the detonating fuse travels by way of the central core through the coupler body and probe into the mating receptacle. All shrapnel and particles generated by the detonation are confined within the fuse by fabric and/or plastic-type insulation sur-

rounding the core. Moreover, as a result of the Allen design, the coupling, although lightweight, is able to withstand pressures as high as 2,000,000 p. s. i. which result from the explosion and also prevent any shrapnel and/or gases from escaping into the surrounding atmosphere. In such a system, the stimulus will have been successfully and safety propagated by the detonating fuse to perform any number of desired operations, *e. g.*, operate a switch, cut a cable, trigger an aircraft or spacecraft escape system, etc.

### The Patent Claims

The patent in suit issued with 10 claims and plaintiff charges defendant with infringing all 10 claims.[1] Moreover, claim 1, which follows, is the only independent claim:

1. A detonating fuse termination comprising:

(A) A detonating fuse;

(B) a coupler body supported about the end of said detonating fuse and having an axial bore of reduced cross-section with respect to the end of said detonating fuse;

(C) a linearly extending, reduced diameter portion of said detonating fuse extending as a probe through and beyond said coupler body;

(D) an environmental seal fixed to that portion of said reduced diameter probe extending beyond said coupler body;

(E) a quick disconnect fitting attached about said coupler body;

(F) said fuse comprising an explosive core, the portion of the explosive core defined by said reduced diameter portion of said detonating fuse having a cross-sectional area which is relatively smaller than the cross-sectional area of said explosive core defined by the unreduced portion of the detonating fuse.

■ It, of course, has long been established that a dependent claim, such as claims 2–10 of the Allen patent, cannot be

infringed unless the accused device is also covered by the independent claim, claim 1. *Dresser Industries, Inc. v. United States,* 432 F.2d 787, 193 Ct.Cl. 140, 167 USPQ 473 (1970). Since, as will be shown hereinbelow, the evidence of record conclusively establishes that the acts of defendant do not infringe claim 1 of the patent in suit, no purpose is served by considering or reproducing dependent claims 2 through 10.

### Infringement

Plaintiff asserts that all detonating fuse termination couplings manufactured in accord with NAVORD Specification Nos. WS9026D and WS15032A infringe the Allen patent. The trial record fails to support plaintiff's charge. Moreover, for reasons which follow, it is concluded that plaintiff has failed to demonstrate convincingly that defendant, during the accounting period relevant to the suit at bar, manufactured and/or used the invention covered by any of the claims of the Allen patent.

By way of background, plaintiff in 1966, in response to a request for proposal, disclosed its NESTS concept to the Lockheed Missiles & Space Co. (hereinafter referred to as "LMSC"). Indeed, during the years 1966 to 1969, LMSC contracted with the plaintiff to do research and development on end termination fittings for use in the "Poseidon" missile system. In accordance with the contract requirements, plaintiff was requested to supply LMSC copies of drawings, specifications and other documents pertaining to the manufacture of the end fittings. As a result, plaintiff drew up NAVORD Specification Nos. WS9026D and WS15032A. In addition, undoubtedly due to their common origin, the drawings of the fittings covered by the NAVORD specifications and certain aspects of the drawings of the Allen patent are strikingly similar.

For reasons which are not relevant to a resolution of the issues before the court, LMSC in 1970 inaugurated a program

---

1. Although there is some confusion as a result of plaintiff's posttrial papers as to whether claims 1–9 or 1–10 of the patent are at issue, this opinion presumes that plaintiff is urging that all 10 claims of the patent are infringed by defendant.

which resulted in LMSC's and plaintiff's each supplying 50 percent of the end fitting requirements of the Poseidon missile contract. Defendant admits that the end fittings supplied by both LMSC and the plaintiff for use on the Poseidon missile are substantially similar.

The LMSC drawings of two accused fittings, Nos. 2763369 and 2763878, disclose a detonating fuse having an end termination consisting of a coupler body and an elongated probe. The textile and plastic layers which normally cover the explosive core are removed from the end of the detonating fuse about which the coupler body is to be mounted. The detonating fuse is then sealed to the coupler body by appropriate adhesive such that the exposed explosive core extends through the coupler body and probe. While the removal of the textile and plastic layers does reduce the cross-sectional diameter of the detonating fuse at the coupler body relative to the remainder of the fuse, it should be emphasized that the cross-sectional area of the explosive core of the detonating fuse has not been altered and remains the same for the entire length of the fuse.

Plaintiff has attempted to read one or more of the claims of the patent in suit on LMSC Drawings 2763369 and 2763878. The accused fittings as represented by these drawings do not show that the cross-sectional area of the explosive-filled metallic core of the detonating fuse which extends through the coupler body and into the probe has been reduced. Indeed, plaintiff has not shown that the NAVORD specifications covering the accused LMSC fittings require, or that the LMSC fittings actually made for or used by defendant have a probe of reduced cross-sectional area as called for by clause (F) of claim 1. To the contrary, the LMSC drawings show that the detonating fuse has an explosive core that is of uniform cross-sectional area throughout its length.

In view of the above observations, plaintiff's arguments have been carefully reviewed so that its infringement argument will not be misunderstood nor incorrectly stated. As a result, it is concluded that plaintiff, in essence, is urging that clause (F) of claim 1 will be met by the mere removal of the textile and plastic sheathing from the body of the detonating fuse. To support this construction, plaintiff stresses that the specification of the patent in suit discloses an embodiment of his invention that does not require a reduction in the cross-sectional area of the explosive core. In particular, plaintiff focuses upon the following language, which begins at col. 2, line 69, and extends through col. 3, line 14, of the patent in suit:

The unique feature of the present method resides in reducing to an absolute minimum the area exposed to the pressure generated by the detonating or deflagrating charges. This is accomplished by reducing the column diameter of the explosive at the terminating attachment to the approximate minimum required to reliably propagate a detonation. * * *

For small detonating fuse such as MDF this may require simply reducing the cross-sectional area to the bare metal covered explosive core. For instance, the assembly shown in FIG. 1 incorporates confined detonating fuse * * * which has an as-made cross-sectional area of .07 sq. in. This has been reduced to the bare metal covered MDF explosive core * * * with a cross-sectional area of only .0017 sq. in. at the attachment.

■ An evaluation of plaintiff's position necessarily requires that the proper scope to be afforded to claim 1 be established. Ascertaining the meaning and coverage to be afforded the claims of a patent in turn requires that the claims be construed in the light of the patent's specification. However, establishing the proper scope of a patent's claim does not stop with a review of the specification for as the Supreme Court has pointed out in *Graham v. John Deere Co.*, 383 U.S. 1, 33, 86 S.Ct. 684, 702, 15 L.Ed.2d 545, 148 USPQ 459, 473 (1966):

* * * an invention is construed not only in light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office.

This direction has continuously been followed by this court. *See, e. g., Autogiro Co. of America v. United States,* 384 F.2d 391, 181 Ct.Cl. 55, 155 USPQ 697 (1967), which stresses that the claims of a patent are necessarily construed in connection with the other parts of the patent, as well as the circumstances surrounding the prosecution of the patent application through the Patent and Trademark Office.

A review of the prosecution history which follows highlights that Mr. Allen's arguments in gaining the allowance of the patent in suit are different from and inconsistent with the arguments presently urged by plaintiff on this court.

The application which eventually matured into the patent in suit was filed in the Patent and Trademark Office on October 13, 1964. As originally filed, the application contained eight method claims (original claims 1–8) and eight apparatus claims (original claims 9–16). Prior to any action by the Patent and Trademark Office, the patentee filed a petition for special application in order to accelerate the processing of his patent application. In connection with the petition, Mr. Allen called four prior art patents to the attention of the Patent and Trademark Office and proceeded to distinguish his invention from those covered by the four prior patents by explaining:

> In an effort to contain the hazardous particles generated [as a result of an explosion], the end of the confined detonating fuse is reduced in cross-sectional area, and then sealed as an elongated probe and enclosed in a quick disconnect coupling. Similarly, the pick up charge and the mating explosive train attachment is reduced in cross-sectional area. By reducing the cross-sectional area of the detonating fuse and the explosive train to the appropriate minimum required to propagate a detonation, there is achieved a corresponding reduction in the total quantity of gas generated.

Moreover, in distinguishing over a particular prior art patent which he called to the attention of the Patent and Trademark Office, Mr. Allen stated:

*Schnepfe* [U.S. Patent No. 3,129,663] does not disclose *the inventive concept of Applicant's invention which includes reducing the diameter of the explosive cross-section* to reduce the total quantity of gas generated, * * *. [Emphasis added.]

That the Patent and Trademark Office examiner in charge of reviewing the application understood the Allen invention to require the reduction of the explosive cross-section at the probe end of the fitting is clear from the following observation in the office action of July 1, 1965:

> In the specification (page 4, lines 1–6) [which now corresponds with col. 2, lines 3–9 of the patent] it is recited that the cross-sectional area of the linear explosive is reduced; yet in Figure 1 the cross-sectional area of the charge *15* is not shown to be reduced in relation to its cross-sectional area in the fuse *10. As the disclosure sets forth that this reduction in area is essential to the effective operation of the device it should be accurately represented* in Figure 1. [Emphasis added.]

Indeed, the above-stated understanding by the examiner of how the Allen invention operated formed the basis of his rejection of the then-pending claims. In particular, the examiner rejected original claims 1, 2, 4, 6, 9, 10, 12 and 14–16, the remainder of the claims having been cancelled by Allen in his petition for special application, since:

> It would be obvious as taught by either Freund [United States Letters Patent No. 289,768] or Long [United States Letters Patent No. 2,876,701] *to reduce the diameter of the fuse of Schnepfe* to mitigate the effect of the explosive force upon detonation. [Emphasis added.]

In his response to the Patent and Trademark Office of November 1, 1965, Allen modified each of the pending claims by deleting all reference to "confined detonating fuses." The claims as amended broadly covered all types and sizes of detonating fuses and were not limited to mild detonating fuses as described in the above-quoted portion of his patent specification. Indeed, it was at this time that Mr. Allen modified

application claim 9 (claim 1 of the patent in suit) by adding the following clause (F):

(F) said fuse comprising an explosive core, the portion of the explosive core defined by said reduced diameter portion of said detonating fuse having a cross-sectional area which is relatively smaller than the cross-sectional area of said explosive core defined by the unreduced portion of the detonating fuse.

In addition, as required by the Patent and Trademark Office, Fig. 1 of the drawing was amended to, in the words of Allen: "* * * show that the cross-sectional area of the explosive charge is reduced as disclosed in the specification."

The patentee repeated arguments, similar to those previously referred, again to distinguish his invention over various prior art references. For example, Mr. Allen specifically made the following argument to the Patent and Trademark Office in urging the patentability of his invention:

Therefore, the combination of *Schnepfe* with either *Freund* or *Long* does not produce applicant's invention as described in Claim 9, which specifically calls for a reduced diameter portion of the detonating fuse and explosive core, as well as for a quick disconnect fitting.

On the basis of the above analysis, all present efforts by the plaintiff to deviate from the previous characterizations of the invention in suit, characterizations which it must be concluded were relied on by the Patent and Trademark Office in issuing the patent, must be resisted.[2] Contrary to plaintiff's present position, it is concluded that claim 1 must be interpreted, consistent with Mr. Allen's original arguments to the Patent and Trademark Office, to include a detonating fuse whose end is reduced in cross-sectional area and then sealed as an elongated probe. Put another way, the addition of clause (F) to claim 1 clearly requires that the cross-sectional area of the explosive core at the probe end be of relatively smaller cross-sectional area than the explosive core in the main body of the fuse.

Having established the proper scope of the claims, it now becomes necessary to determine if any of the claims reads on the accused LMSC end fittings.

■ The touchstone by which an accused device is to be gauged is, in the first instance, the claims of the patent. Infringement *vel non* is evaluated by a comparison of the accused devices with the claims of the patent which set out the metes and bounds of the invention. *See Interdent Corp. v. United States,* 531 F.2d 547, 550, 209 Ct.Cl. 301, 306 (1976), which not only states the above proposition, but also points out that the claims of a patent as distinguished from the drawings and specification define the invention covered by the patent.

■ Plaintiff would have the question decided by comparing the accused end termination to the commercial version of plaintiff's end termination. The folly of such a comparison was pointed out in *Tektronix, Inc. v. United States,* 179 USPQ 703, 704 (Ct.Cl.1973), where it was stated:

* * * due regard must always be given to the proposition that plaintiff's right to compensation is ultimately dependent on a comparison between a commercial device and the claims of the patent, not on a comparison of two commercial devices. *Hartford-Empire Co. v. Obear-Nester Glass Co.,* 39 F.2d 769, 4 USPQ 483 (8th Cir. 1930). Hence, it is not enough merely to demonstrate the equivalency of two commercial devices.

*See Graver Mfg. Co. v. Linde Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, 85 USPQ 328 (1950).

■ Before turning to a consideration of plaintiff's charge of infringement, it should also be explained that each and every clause of a claimed invention is considered to be material and essential. *See Strumskis v. United States,* 474 F.2d 623, 627–28, 200 Ct.Cl. 668, 676, *cert. denied,* 414 U.S. 1067,

---

2. Accordingly, the mere fact that the patent specification may disclose an embodiment of plaintiff's invention that does not reduce the cross-sectional area of the explosive core is of no moment, since no claims were allowed to cover that type of arrangement.

94 S.Ct. 576, 38 L.Ed.2d 472 (1973). Accordingly, the absence of even one element and its equivalent function of a claimed invention places the accused device outside the coverage of the claims.

Having previously determined that clause (F) is an essential part of claim 1, and that plaintiff has failed to show that the accused devices have a probe of reduced cross-sectional area, it must be concluded that plaintiff has failed to establish infringement of not only independent claim 1, but also of dependent claims 2–10.

## CONCLUSION OF LAW

The court concludes as a matter of law that claims 1–10 of the patent in suit are not infringed by defendant. Plaintiff, accordingly, is not entitled to recover and its petition is therefore dismissed.